[825 NYS2d 28]

DEAN PELTON et al., Respondents, v 77 PARK AVENUE CONDO-
MINIUM, Defendant, and JOHN HORVITZ et al., Appellants.

First Department, November 21, 2006

## APPEARANCES OF COUNSEL

*Graubard Miller*, New York City (*Lawrence D. Bernfeld* of counsel), for appellants.

*Law Offices of Jay J. Gurfein*, New York City (*Mariam Anwarzai* and *Jay J. Gurfein* of counsel), for respondents.

*Snow Becker Krauss P.C.*, New York City (*Marc J. Luxemburg and Daniela Alba* of counsel), for Council of New York Cooperatives and Condominiums, amicus curiae.

### OPINION OF THE COURT

SULLIVAN, J.

This is an appeal from the denial of summary judgment dismissing the complaint asserting discriminatory practices in violation of the New York City Human Rights Law (NYCHRL), and seeking, inter alia, $23.5 million in compensatory and punitive damages based on an alleged failure to make handicap accessible the residential condominium in which the disabled plaintiff and his wife, also a plaintiff, reside. The appealing defendants are the nine volunteer members of the board of managers of the condominium, also a defendant, who moved on the basis of the business judgment rule, and the building's managing agent, which moved on the basis of common-law agency principles.

Plaintiff Pelton, the owner of unit 5-G at 77 Park Avenue, is 62 years of age and suffers from muscular dystrophy. As a result, as alleged, it has been "a physical and emotional ordeal" for him "to navigate the steps" in the common areas of the building since the end of 2001. Specifically, the building is constructed with one step without a handrail at its street entrance, and three additional steps leading from the lobby to the passenger elevator. There are five more steps from the passenger elevator hallway to the freight elevator, which residents were required to use while the passenger elevator was being renovated. There are also steps leading to the laundry room and to plaintiffs' storage area.

In June 2002, Pelton advised defendant Horvitz, the president of the condominium's board of managers, that he suffered from muscular dystrophy and asked if the building could be made handicap accessible. Horvitz said he would look into it. For the next six months, whenever Pelton saw Horvitz, he would ask about progress with respect to his request. Each time, according to Pelton, Horvitz would repeat his prior response, that he "was working on it." In July 2002, Horvitz told Pelton that he had been advised that the condominium had no legal obligation to provide handicap accessibility.

In June 2003, Pelton was diagnosed with a torn meniscus in his right knee, attributed by his physician to the strain placed on his knees at 77 Park Avenue. According to Pelton, his wife

asked the building superintendent if the board of managers could install a ramp at the building's front entrance or construct a handrail to assist him. The superintendent responded that "we'll look into it," but nothing was done.

During the summer of 2003, Pelton contacted the New York City Commission on Human Rights (HRC), which, after an investigation, determined that the building could accommodate handicap access. In a September 26, 2003 letter, HRC notified the managing agent that Pelton had made "an informal complaint" regarding the lack of disability access at the building. The letter advised that city, state and federal law prohibited discrimination based on disability, and that HRC representatives had visited the building and determined that the building lobby could accommodate a code compliant ramp. Other than Pelton's conversations with Horvitz, this letter was the board's first notice regarding plaintiffs' Human Rights Law claim.[1] In response to the HRC letter, the managing agent, by letter dated October 15, 2003, advised plaintiffs that the condominium had retained architects to investigate the possibility of modifying building access in conformity with code requirements.

In a letter to HRC the following month, a law firm engaged by the condominium wrote that while the condominium wanted to make a reasonable accommodation for Pelton with regard to the building's entry, two architects had determined that in terms of "both physical impracticality and cost," the installation of ramps would appear not to be reasonable. The letter further stated that the condominium's board of managers was "reasonably certain" that, in terms of access to the lobby and elevators, there had been no significant alteration since the building was built in 1924. The letter concluded that the condition complained of existed when the building became a condominium and when Pelton purchased his apartment.

By letter of the same date, the managing agent advised HRC that representatives of both it and the board had met with architects and had discussions with legal counsel for the condominium association regarding their "options" and "responsibility" with regard to the complaint. By letter of March 8, 2004, HRC informed the attorneys for the condominium that a senior designer in the architecture department of the United Spinal Association had visited the building and proposed a plan for

---

1. The condominium's bylaws require written notice of any desired board action.

construction of a 21-foot ramp with handrails, leading to the building entrance, and the temporary use of an inclined wheelchair lift to provide access to the freight elevator inasmuch as the passenger elevator was temporarily out of service at the time of the designer's visit.

Plaintiffs' counsel wrote to the managing agent on April 6, 2004, stating the firm's opinion that Pelton had a meritorious claim against the condominium and its board, and expressing the hope that the matter could be resolved amicably. In the weeks that followed, after communicating with defendant board member Shaw and, later, defendant board member Benton, with regard to the problem, Pelton became "extremely encouraged."

By letter of June 10, 2004, the board of managers advised plaintiff that it had agreed to pursue a plan for handicap access "to the extent that same is legally, mechanically and economically feasible." The short-term solution proposed by the board involved a portable wheelchair lift to be operated by building personnel to assist Pelton in navigating the stairs to the passenger and service elevators. The long-term solution involved providing access through the snowblower storage room and the installation of platform lifts to both the passenger and service elevators.

In the same letter, the board also suggested that Pelton could "swap" his storage area for the "new storage room," which would be easily accessible, and that condominium rules would be waived to permit him to install a washing machine in his apartment. The letter also indicated that a new directive was being issued to the building staff, on duty 24 hours a day, to assure that optimum assistance would be available to him. The board requested that he sign the letter to indicate agreement to the proposals, but Pelton, on the advice of counsel, refused. At his deposition, he admitted that the "snowblower room" accommodation offered in the letter was reasonable.

Pelton responded to the letter one week later by writing directly to board member Shaw, with whom he felt he had established a rapport. He stated that when he, Shaw and Benton had discussed the problem late in May, Benton had said a portable chair lift was going to be ordered and would be in the building within several weeks. "[D]ishearten[ed]" that accommodations had not yet been made, and that the board had only "outline[d] plans" and not made "more of a real commitment," Pelton stated that he was "unwilling to sign the letter without some changes."

On July 14, 2004, plaintiff, along with Shaw, Benton and a representative of the managing agent, attended a demonstration of the Garaventa lift, a portable stair climber, in the building lobby. After Shaw explained that the stair climber was intended to be used until June 2005, when the passenger elevator renovation would be completed, at which time a permanent access solution would be explored, Pelton complained that the board was "dragging its feet and was violating the law," discriminating against him by its failure over $2^1/2$ years to resolve the problem.

Thereafter, on July 29, 2004, Shaw left a message on Pelton's answering machine that the board was taking the position that the portable stair climber was an acceptable permanent solution. Later that summer, a law firm retained by the building, the board and the managing agent contacted HRC in the hope of resolving the matter. After HRC advised Pelton of the building's interest in negotiating the matter, he refused to discuss the matter further, and instead commenced this action against the board members individually, the building and the managing agent, alleging that they discriminated against him by failing to make reasonable accommodations to allow him access to his apartment.

Meanwhile, the board purchased the Garaventa lift and placed it in operation on November 16, 2004, less than two months after the commencement of this action, at a cost of $13,000. Correspondence between counsel, which ended on or about November 19, after the installation of the lift and before defendants served their answer, reflects that the parties reached a stalemate. While Pelton indicated an interest in settling the matter, he wanted a full set of plans and a professional estimate of the starting and completion dates of construction. Defendants were unwilling to incur additional expenses, but would contract for a full set of plans and specifications, including—"[i]f legally and economically feasible"—an estimate of the starting and completion dates, only if plaintiff would waive his objections to the snowblower room proposal (in addition to the existing Garaventa lift) as a reasonable accommodation.

On September 12, 2005, a newly developed proposal, the "east/west" plan, and a $130,000 assessment to fund the plan, were approved at a special meeting of unit owners, which plaintiffs did not attend or participate in by proxy. At his deposition, however, Pelton admitted that either the snowblower room plan or the east/west plan would reasonably accommodate him.

In their answer, defendant board members and managing agent asserted counterclaims for declaratory judgment that the Garaventa lift, as implemented, and the snowblower room proposal, if feasible and as implemented, constituted reasonable accommodations as to Pelton's physical condition under the NYCHRL. Thereafter, by notice dated July 21, 2005, these defendants moved for summary judgment dismissing the complaint. The board members argued that since they acted in good faith and exercised honest judgment in responding to and handling Pelton's request for reasonable accommodations, their actions are shielded from judicial scrutiny. In so arguing, they stressed that they had relied on the advice of counsel and their architects and heeded HRC's recommendations in attempting to make the building handicap accessible. Furthermore, they argued that given the condominium's bylaw requirements as to expenditures,[2] they acted prudently in first attempting to obtain Pelton's approval before presenting their accommodation proposals to the unit owners for a vote. The managing agent argued that no cause of action lies for a third party against an agent of a disclosed principal based on the agent's alleged omissions or failure to act.

Supreme Court denied the motion in its entirety, rejecting the individual board members' argument that their actions were protected by the business judgment rule, which, it held, afforded no immunity where the board's decision is alleged to have been made on an unlawful discriminatory basis. As to the managing agent, the court, while acknowledging the general rule of nonliability upon which the agent relied, pointed to the exception that an agent for a disclosed principal is not shielded from liability for its affirmative acts of negligence. Significantly, however, the court failed to identify any such act on behalf of the individual board members or the managing agent. It also held, citing Human Rights Law (New York City Administrative Code) § 8-107 (5) (the effect of which is to extend liability for discriminatory acts to the managing agent of an owner), that "the managing agent's status as the agent for a disclosed principal does not as a matter of law shield it from plaintiff's claims." We reverse.

"[T]he business judgment rule prohibits judicial in-

---

2. Under section 13 of its bylaws, approval by 50% or more of the unit owners is required to make structural alterations having an estimated cost of more than $50,000.

quiry into actions of corporate directors 'taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.' So long as the corporation's directors have not breached their fiduciary obligation to the corporation, 'the exercise of [their powers] for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient' " (*Matter of Levandusky v One Fifth Ave. Apt. Corp.,* 75 NY2d 530, 537-538 [1990] [citations omitted]).

Recognizing the competing interests among unit owners that are often at issue in board decisions, the *Levandusky* court cautioned:

"A . . . condominium is by nature a myriad of often competing views regarding personal living space, and decisions taken to benefit the collective interest may be unpalatable to one resident or another, creating the prospect that board decisions will be subjected to undue court involvement and judicial second-guessing. Allowing an owner who is simply dissatisfied with particular board action a second opportunity to reopen the matter completely before a court, which—generally without knowing the property—may or may not agree with the reasonableness of the board's determination, threatens the stability of the common living arrangement. Moreover, the prospect that each board decision may be subjected to full judicial review hampers the effectiveness of the board's managing authority" (*id.* at 539-540).

Thus, the Court of Appeals decided that the appropriate standard for judicial review of decisions of boards of managers of residential condominiums and cooperative corporations "is analogous to the business judgment rule applied by courts to determine challenges to decisions made by corporate directors" (*id.* at 537).

This "deferential standard" that has become the hallmark of the business judgment rule (*40 W. 67th St. v Pullman,* 100 NY2d 147, 155 [2003]) requires the courts to "exercise restraint and defer to good faith decisions made by boards of directors in business settings" (*id.* at 153). Thus, in *Pullman,* where a residential cooperative corporation terminated the tenancy of a shareholder-tenant, the Court of Appeals held: "To trigger fur-

ther judicial scrutiny, an aggrieved shareholder-tenant must make a showing that the board acted (1) outside the scope of its authority, (2) in a way that did not legitimately further the corporate purpose or (3) in bad faith" (*id.* at 155).

As a review of the record clearly reflects, plaintiff has failed to make a showing of any of the three elements that would trigger judicial scrutiny of the board's action. Nor, as already noted, could Supreme Court, in its denial of the motion, point to a single fact giving rise to liability on the part of any of the defendants. Distilled to its essence, the alleged wrongdoing is the board's delay in reconstructing the building to eliminate the steps that were in place long before passage of the Human Rights Law. But, as the board showed in moving for summary judgment, it has permitted Pelton to have a washing machine in his apartment and agreed to change the location of his storage locker so as to eliminate any inconvenience to him. It has spent $13,000 to purchase a Garaventa lift to eliminate the need for Pelton to ascend or descend steps leading to the building eleva-tors. The board attempted to reach a mutually agreeable accom-modation providing access enhancements, but Pelton refused to confirm in writing that he would accept such accommodations if implemented. When Pelton belatedly acknowledged that he would accept an architect's proposed structural alterations as a reasonable accommodation, the board, on the advice of counsel, followed condominium bylaw requirements and requested and received the unit owners' approval and a related $130,000 as-sessment, pursuant to which the unit owners would pay for the structural alteration plan. The individual board members' show-ing thus established that the board, in reliance upon the profes-sional advice of its architects and counsel, satisfied the business judgment rule's requirement of taking action in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of the condominium's purposes.

The burden thereupon shifted to plaintiffs, who, to defeat summary judgment, would have to offer proof of unlawful discrimination sufficient to raise a triable issue of material fact (*see e.g. Hitter v Rubin*, 208 AD2d 480 [1994]). Conclusory or speculative allegations of discrimination are insufficient to deprive corporate directors of the protection of the rule preclud-ing judicial scrutiny of board decisions (*see Captain's Walk Homeowners Assn. v Penney*, 17 AD3d 617 [2005]; *Jones v Sur-rey Coop. Apts.*, 263 AD2d 33, 36-37 [1999]).

In bringing an action against the individual members of a co-operative or condominium board based on allegations of

discrimination or similar wrongdoing, plaintiffs were required to plead with specificity independent tortious acts by each individual defendant in order to overcome the public policy that supports the business judgment rule (*see Murtha v Yonkers Child Care Assn.,* 45 NY2d 913 [1978]; *Konrad v 136 E. 64th St. Corp.,* 246 AD2d 324 [1998]). In *Konrad,* where the complaint failed to allege any independent wrongful conduct by an individual director of a cooperative, the Court stated (at 326):

> "That the cooperative corporation's board of directors may have taken action that 'deliberately singles out individuals for harmful treatment' does not, ipso facto, expose the individual board members to liability. The proposed cause of action ascribes no independent tortious conduct to any individual director, and plaintiff's proposed . . . cause of action is therefore deficient as a matter of law" (citation omitted).

Here, neither the complaint nor plaintiffs' submissions on the motion assert a specific claim against any of the individual defendants other than as a member of the 77 Park board. In *Brasseur v Speranza* (21 AD3d 297 [2005]), this Court, noting that the complaint failed to plead the individual members of a cooperative's board of directors had "acted tortiously other than in their capacity as board members," dismissed a cause of action as to the individual members (*id.* at 298). As in *Pekelnaya v Allyn* (25 AD3d 111 [2005]), where this Court rejected the claim of an injured party who sued the individual unit owners of a condominium for a defect in a common area of the condominium, the common elements of a condominium are solely under the control of the board of managers. The same reasoning applies here to the individual members of the board of managers, since control of the board's policies lies in the hands of the board collectively, not in the hands of any individual member.

Plaintiffs have failed to show that any board member, much less each board member, has engaged in individual wrongdoing. In fact, Pelton does not even allege contact with each of the board members, much less acts of discrimination separate and apart from the actions taken by the board members collectively on behalf of the condominium. Supreme Court's decision, if permitted to stand, would, without any evidence of individual wrongdoing, subject these defendants to expensive, intrusive and time-consuming litigation (*see Konrad,* 246 AD2d 324

[1998]), hardly a fitting reward for those "fellow tenants who volunteer their time, without compensation" as members of a governing body that takes on the burden of managing the property for the benefit of the other owners (see *Levandusky*, 75 NY2d at 536-537).

The standard set forth in *Levandusky*, which permits review of board decisions "when the challenger demonstrates that the board's action has no legitimate relationship to the welfare of the cooperative, deliberately singles out individuals for harmful treatment, is taken without notice or consideration of the relevant facts, or is beyond the scope of the board's authority" (*id.* at 540), should also serve as a minimum standard for challenging the conduct of individual board members. Nothing in this record offers even a suggestion that these criteria have been met as to any board member. Courts must hold those who would challenge the decisions of condominium and cooperative boards to the requirement of pleading with specificity claims of discriminatory conduct or wrongdoing. Otherwise, the threat of baseless litigation, with its attendant serious financial and personal burdens,[3] would pose a formidable obstacle to those willing to volunteer their talent, experience and knowledge for the common good of their homeowner communities by serving on such a board.

As to the other moving party, the managing agent correctly argues that as an agent for a disclosed principal it is not liable to Pelton, a third party, for nonfeasance. It has long been an "established rule of law that the agent is not liable to third persons for non-feasance but only for affirmative acts of negligence or other wrong" (*Greco v Levy*, 257 App Div 209, 211 [1939], *affd* 282 NY 575 [1939]). The reason is clear. "Unless the agent has assumed authority and responsibility, as if he were acting on his own account, then the duty which the agent fails to perform is a duty owing only to his principal and not to the third party to whom he has assumed no obligation" (*Jones v Archibald*, 45 AD2d 532, 535 [1974]).

Here, plaintiffs have not pleaded or shown circumstances that would demonstrate either that the managing agent owed Pelton

---

3. Here, plaintiff seeks the outrageous sum of $23.5 million in punitive and compensatory damages, a figure that may surface as a contingent liability on the individual board members' personal financial reports or have other adverse collateral consequences to them. And, of course, public policy precludes insurance coverage for punitive damage claims (*see Biondi v Beekman Hill House Apt. Corp.*, 94 NY2d 659, 663 [2000]).

a duty or that it was affirmatively negligent. As managing agent, it lacked authority to direct structural alterations to the building. Nor, as plaintiffs contend, can it be held accountable to them for failing to counsel the board to perform the necessary alterations, since the duty it allegedly failed to perform would have been owed to its principal, the board, not to plaintiffs (*Greco*, 257 App Div at 210-211). In accordance with this "established rule of law," the managing agent cannot be held liable for a claimed failure to counsel the board to act to make the building disability accommodating.

In justifying the denial of summary judgment to the managing agent, Supreme Court cited *Bartman v Shenker* (5 Misc 3d 856, 863 [2004]), which noted that liability under the Human Rights Law could be imposed upon an owner's agent based upon a violation of New York City Administrative Code § 8-107 (5).[4] In *Bartman*, which is readily distinguishable, the building owner's agent refused to provide any reasonable accommodation to the handicapped plaintiff beyond agreeing to store a portable ramp that the plaintiff provided. Here, the managing agent was unaware of Pelton's request until it received HRC's letter, to which it responded and took immediate action, retaining architects to determine whether Pelton's disability could be reasonably accommodated.

Plaintiffs' chief complaints against the managing agent—that it utilized stall tactics in providing unsupportable statements to HRC that the building had retained architects to address the access issue, and advised Pelton that elevator renovations were a higher priority than work required for handicap access—are without merit. Aside from engaging two separate architects to render opinions as to the building's handicap accessibility, it provided a reasonable accommodation to Pelton by way of the Garaventa lift during the elevator renovation, even if it did suggest that the renovation was of a higher priority. The NYCHRL provides a remedy against a managing agent only upon a show-

---

4.   "It shall be an unlawful discriminatory practice for the owner, lessor, lessee, sublessee, assignee, or managing agent of, or other person having the right to sell, rent or lease or approve the sale, rental or lease of a housing accommodation, constructed or to be constructed, or an interest therein, or any agent or employee thereof: . . .
"(2) To discriminate against any person because of such person's . . . disability . . . in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or an interest therein or in the furnishing of facilities or services in connection therewith." (Administrative Code § 8-107 [5] [a].)

ing that the agent has committed a discriminatory act. None has been shown here.

We have examined plaintiffs' other arguments and find them without merit.

Accordingly, the order of the Supreme Court, New York County (Judith J. Gische, J.), entered January 24, 2006, which denied the motion of the individual defendants and Buchbinder & Warren LLC for summary judgment, should be reversed, on the law, with costs and disbursements, the motion granted and the complaint dismissed as against them. The Clerk is directed to enter judgment accordingly.

Motion seeking leave to file amicus curiae brief granted.

FRIEDMAN, J.P., WILLIAMS, SWEENY and McGUIRE, JJ., concur.

Order, Supreme Court, New York County, entered January 24, 2006, reversed, on the law, with costs and disbursements, defendants' motion for summary judgment granted and the complaint dismissed. The Clerk is directed to enter judgment accordingly. Motion seeking leave to file amicus curiae brief granted.